FILED

MAR 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

#83059-080
RODNEY DOGGETT, RUSSELL #04899-017
KAEMMERLING, GARY CALLAHAN, #01628-174
and BRIAN CULWELL, #66553-079
    FCI SEAGOVILLE    POB 9000
        Plaintiffs
    SEAGOVILLE, TX. 75159
vs.

ALBERTO GONZALES, U.S. ATTORNEY
GENERAL; F. JAMES SENSENBRENNER,
U.S. REPRESENTATIVE; JAY
APPERSON; LEONIDAS MEACHUM,
DIRECTOR, ADMINISTRATIVE OFFICE
OF THE COURTS; DONNA BUCELLA
DIRECTOR, EXECUTIVE OFFICE FOR THE
U.S. ATTORNEYS; JOHNNY SUTTON,
CHUCK ROSENBERG, PAUL K. CHARLTON,
and GREGORY MILLER, U.S. ATTORNEYS;
RICARDO HINOJOSA, CHAIRMAN,
U.S. SENTENCING COMMISSION,

        Defendants

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

CAUSE NO. _____
(JURY)

CASE NUMBER  1:06CV00575

JUDGE: Reggie B. Walton

DECK TYPE: Pro se General Civil

DATE STAMP: 03/29/2006

JURY
ACTION

PLAINTIFFS' ORIGINAL COMPLAINT AND

MOTION FOR CLASS CERTIFICATION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME PLAINTIFFS, ET AL, and for their complaint against Defendants state the following:

I. PARTIES

1.    Plaintiffs are Rodney Doggett, Russell Kaemmerling, Gary Callahan and Brian Culwell, and are all citizens of the State of Texas residing in Seagoville, Texas.

2.        Defendants United States Attorney General Alberto Gonzales, U.S. Representative F. James Sensenbrenner, Jay Apperson, Executive Office of the Courts, Executive Office of the United States Attorneys, Ricardo Hinojosa, Chairman United States Sentencing Commission, and United States Attorneys: Johnny Sutton, Chuck Rosenberg, Paul K. Charlton and Gregory Miller. Service on Defendants may be effected by certified mail under 28 U.S.C. §1391(e) and the Federal Rules of Civil Procedure.

## II. JURISDICTION

3.        This Court's jurisdiction exists pursuant to 28 U.S.C. §1331 & §1346 because the action arises under the United States Constitution. Specifically, the jurisdiction of this Court is invoked to secure protection and redress deprivation of rights guaranteed by the U.S. Constitution, including the right of access to courts arising under the Privileges and Immunities Clause, Article IV, section 2 of the United States Constitution; the First, Fourth, Fifth and Sixth Amendments to the United States Constitution.

## III. VENUE

4.   Venue is proper under 28 U.S.C. §1391(b)(e)(1)(2).

## IV. FACTS

### U.S. v. Booker Constitutional Right

5.      On January 12, 2005, the United States Supreme Court issued two individual and unique majority opinions in the case of U.S. v. Booker, 160 L.Ed.2d 621 (2005). The first majority opinion (Booker I) was delivered by Justice Stevens, joined by Scalia, Souter, Thomas and Ginsburg, JJ, expressed the view that: 1) the Sixth Amendment right to a jury trial, as construed in Blakely v. Washington, 159 L.Ed.2d 403 (2004), applied to the United States Sentencing Guidelines; and 2) the Court reaffirmed its holding in Apprendi v. New Jersey, 147 L.Ed.2d (2000), that the Constitution requires that any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty, or a jury verdicts must be admitted by the defendant, or proved to a jury beyond a reasonable doubt.

6.      The second majority opinion, delivered by Justice Breyer, joined by O'Connor, Rhenquist, Kennedy and Ginsburg, JJ, (Booker II) established a patch, or a fix, in the form of a new sentencing procedure, necessary now that the United States Sentencing Guidelines system (U.S.S.G.) in place subsequent to the passage of the Sentencing Reform Act of 1984 (SRA), was declared constitutionally infirm. Arguably, Booker II was necessitated by the

3

holdings in Booker I. It is the rulings of Booker I that are germane to this action. The procedural rule established in Booker II has no bearing on this action.

7.     The rulings in Blakely and in Booker I created no new procedural rule. It was a fundamental right, inherent in the U.S. Constitution from its inception, supported by ample case law, that no penalty could be imposed on facts not found by a jury beyond a reasonable doubt, or pled to by a criminal defendant, until Congress imposed upon the courts the illegal, unconstitutional, mandatory sentencing guideline scheme. See Townsend v. Burke, 92 L.Ed 1690 (1948)("It is not the duration or severity of this sentence that renders it constitutionally invalid; it is the careless, or designed, pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct . . . that renders the proceedings lacking in due process.")

8.     Further, by declaring the U.S.S.G. unconstitutional, the sentences imposed pursuant to them are illegal for an unconstitutional law is an illegal law since its inception:

> The validity of the judgments is assailed on the ground that the acts of Congress under which the indictments were found are unconstitutional. If this position is well taken, it affects the foundation of the whole proceedings. An unconstitutional law is void, and is as no law. An offence created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void and cannot be a legal cause of imprisonment. It is true, if no writ of error lies, the judgment may be final in the sense that there may be no means of reversing it. But personal liberty is of so great moment in the eye of the law that the judgment of an inferior court affecting it is not deemed so conclusive but that, as we have seen, the question of the court's authority to try and imprison the party may be reviewed on habeas

4

> corpus by a superior court or judge having authority to
> award the writ. We are satisfied that the present is one of
> the cases in which this court is authorized to take such
> jurisdiction. We think so because, if the laws are
> unconstitutional and void, the Circuit Court acquired no
> jurisdiction of the causes. Its authority to indict and try
> the petitioners arose solely upon these laws.

Ex parte Siebold, 25 L.Ed 717 (1880)(emphasis added).

9.      Despite its 1880 ruling, Siebold is particularly relevant to

Plaintiffs' cases. The U.S.S.G. have been ruled, in pertinent part,

unconstitutional. Any action taken pursuant to the unconstitutional

provision is void. Siebold made clear: in such cases, a party's case

should be reviewed on the merits. Accordingly, Plaintiffs' cases

should be addressed on the merits; thus, Plaintiffs should be

entitled to full and meaningful access to the courts.


Sentencing Reform Act


10.      In 1984 Congress enacted the Sentencing Reform Act, (SRA),

which imposed the mandatory Federal Sentencing Guidelines on all

federal courts. The mandatory guidelines bound each court to this

sentencing scheme when imposing any sentence for a crime of

conviction.


11.      The SRA, when enacted, required a criminal defendant to be

convicted of the crime to which the sentence would be imposed. In

the early amendments to the SRA, the requirement of conviction was

changed to allow a criminal defendant to be sentenced on what was

called "real crime conduct," and later coined as "relevant conduct."

5

12.    By incorporating "relevant conduct" into the mandatory USSG, the Defendants were relieved of their constitutional requirement of the "grand jury indictment" on facts and elements that would later be used to impose the Plaintiffs' sentences. The Defendants, under the shield of the USSG, were not required to allege anything except the barest of facts in order to secure an "open-ended plea agreement" which contained only a general description of the statute violations. In a trial by jury, the Defendants only needed to secure a guilty verdict of some core crime.

13.    After the plea agreement was signed, or the jury's verdict was rendered, the Defendants would then supply the probation officer, with alleged information (so-called "relevant conduct") Defendants desired to include in the Pre-sentence Investigation Report. Such "relevant conduct" was used to unlawfully enhance the sentence. The Government was allowed to use conduct that was not charged and proven beyond a reasonable doubt.    Even <u>acquitted conduct</u> was used as relevant conduct for sentencing purposes. The Defendants were allowed to follow this practice even in cases where the conduct had a <u>statutory provision for charging the violation</u> in the indictment, such as Obstruction of Justice.

14.    The process did more than deprive the Plaintiffs of the very basic due process protections  It shifted the burden of proof from the Defendants to the Plaintiffs. The Plaintiffs had to prove they were not guilty, when Defendants had only to meet the much lower preponderance of evidence standard.    This was all done in a setting

in which the rules of evidence did not apply, hearsay and speculation were allowed and the Plaintiffs were without the protection of the jury. Moreover, the Defendants got "two bites at the apple" because Plaintiffs could be sentenced for acquitted conduct.

15.    The SRA's creation of relevant conduct and the mandatory guidelines was unconstitutional when it was enacted. The courts embraced the Defendants' unconstitutional practice by relying on the mandatory sentencing guidelines of the SRA. The courts, through the application of the constitutional avoidance doctrine, developed volumes of case law to support the unconstitutional deprivation of the Plaintiffs' liberty. The case law was used to deny the Plaintiffs' challenges to the constitutionality of the deprivation of their liberty.

16.    Defendants' unconstitutional practice under the SRA's sentencing scheme relied on pursuing terms of imprisonment based on judge found facts under a preponderance of the evidence standard. The Plaintiffs appealed these illegally enhanced sentences.

17.    As the number of illegally sentenced criminal defendants increased, litigation increased. After several years of an unconstitutional sentencing scheme and courts' reluctance to correct the illegal sentences, numerous filings bogged down the judicial system. The courts failed to correct the unconstitutional sentences and instead sought the assistance of Congress.

18.    Congress intervened, not by correcting that which was unconstitutional, but instead by enacting the Anti-terrorism and Effective Death Penalty Act of 1996. With the AEDPA, Congress placed highly restrictive procedural bars in the Plaintiffs' path to post conviction relief. Under the AEDPA's procedural bars, the courts developed case law pursuant to the unconstitutional mandatory guidelines to deny Plaintiffs' challenges. After the first rejection, Plaintiffs were denied access to the court for any further attempt at correcting their illegal sentences.

19.    In drafting AEDPA, Congress did not include any provision that would allow Plaintiffs an avenue or vehicle to correct a sentence derived from and pursuant to the unconstitutional mandatory guidelines. The courts are aware of this denial of access to the courts, but have denied Plaintiffs a means to correct the constitutional violations. The courts have rejected literally tens of thousands of filings seeking to correct unconstitutional and illegal sentences.

20.    As of the date of this filing, the Defendants zealously advocate the continued imposition of the unconstitutionally imposed sentences between the years 1987 and 2005. The Defendants continue to advocate the use of judge found facts based on preponderance of the evidence, contrary to the Constitution, Supreme Court precedent and the Rule of Law.

8

21.     The Defendants have used the courts in their continued effort to maintain the finality of convictions through the avoidance doctrine, thereby denying Plaintiffs true and meaningful access to the courts.

22.     From the day the SRA was implemented in 1987, there has been a continuing constitutional violation. The constitutional violations have been suffered by tens of thousands of American citizens who were deprived of their liberty pursuant to an unconstitutional act of Congress. Many of these citizens have served their sentences. Others are still suffering from the effects of the unconstitutional act. Defendants have violated a basic right of Plaintiffs: those who suffer have no avenue, vehicle, or forum in which to redress these issues.

23.     Upon signing the AEDPA bill, then President Bill Clinton declared AEDPA was intended to "streamline Federal Appeals for convicted criminals sentenced to the death penalty" but not to make substantive changes in the standards for granting the writ. The President stated that he would not have "signed this bill" if he thought the Federal Courts would "interpret[] [it] in a manner that would undercut meaningful Federal habeas corpus review." He called upon "the Federal Courts . . . [to] interpret these provisions to preserve independent review of Federal legal claims and the bedrock constitutional principle of an independent judiciary." See FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE, Third Edition, James Liebman and Randy Hertz, §3.2, pages 108-109. Of course, Defendants have

undercut all meaningful review for Plaintiffs.

24.    Plaintiffs presented their 5th and 6th Amendment constitutional challenges in court from the inception of their individual cases. The Supreme Court, in Booker, validated Plaintiffs' constitutional arguments. After nearly twenty years of an unconstitutional sentencing scheme, Plaintiffs achieved an opportunity to present their substantial constitutional questions. When Plaintiffs presented their challenges, based on the Supreme Court declaring their sentences illegal, however, Defendants still denied their access to the courts.

25.    Plaintiff Doggett, presented his 5th and 6th Amendment objections and challenges at trial (Doggett's case was tried to a jury), at sentencing, to the United States Supreme Court, via §2255, and after the United States Supreme Court ruling in Blakely v. Washington, via supplement to his §2255 (Plaintiff's challenges occurred before Booker.) The Fifth Circuit, in U.S. v. Gentry, 432 F.3d 600 (5th Cir. 2005), slammed the door shut on Plaintiff Doggett by denying review of all §2255 claims on Booker. The District Court refused to consider the case on its merits.

26.    Plaintiff Doggett's case is merely a representative example of the Plaintiffs and all members of the proposed class. After the Supreme Court's ruling in Booker, each Plaintiff believed he would have the illegal sentence corrected by having the unconstitutional portions removed. However, the Defendants, working in concert, have

erected  insurmountable  barriers  to  the  correction  of  an  illegal
sentence.

## V. COUNT ONE -- DENIAL OF ACCESS TO THE COURTS

.27.    In Booker, the Supreme Court made very clear that the
mandatory nature of the Federal Sentencing Guidelines which were the
result of the Sentencing Reform Act of 1984, were violative of the
Fifth and Sixth Amendments to the United States Constitution. These
guidelines  did  not  suddenly  become  unconstitutional,  but  were
unconstitutional ab initio. Government estimates indicate that sixty
percent of all federal inmates, or in excess of 100,000, are
currently serving constitutionally infirm sentences and are being
denied access to the courts by Defendants.

28.    Plaintiffs have the right of access to the courts. "The
right of access to the courts is basic to our system of government,
and it is well established today that it is one of the fundamental
rights protected by the Constitution." Ryland v. Shapiro, 708 F.2d
967 (5th Cir. 1983). By denying Plaintiffs their right of access to
the courts, as set forth herein, the Defendants have deprived the
Plaintiffs' constitutional rights. In Chambers v. Baltimore and Ohio
Railroad, 52 L.Ed. 143 (1907), the Supreme Court characterized the
right of access in the following terms:

> The right to sue and defend in the courts is the alternative
> of  force.  In  an  organized  society  it  is  the  right
> conservative of all other rights, and lies at the foundation
> of orderly government. It is one of the highest and most
> essential privileges of citizenship, and must be allowed by
> each state the citizens of all other states to the precise

extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

29.    The right of access to the courts is one of the privileges and immunities accorded citizens under Article IV and the 14th Amendment of the U.S. Constitution. Additionally, the right of access to the courts is embodied in the First Amendment of the U.S. Constitution. See California Motor Transport Co. v. Trucking Unlimited, 30 L.Ed.2d 642 (1972)(holding the right of access to the courts is indeed but one aspect of the right of petition.)

30.    A third constitutional basis for the right of access to the courts is found in the Due Process Clause. In Wolf v. McDonnell, 41 L.Ed.2d 935 (1974), the Supreme Court defined the right of access as:

> The right of access to the courts is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act has less importance in our constitutional scheme than does the Great Writ.

31.    The Due Process Clause has also been construed to allow prisoners meaningful access to the courts. See Bounds v. Smith, 52 L.Ed.2d 72 (1977). There is no iron curtain between the Constitution and the prisons in this country. The touchstone of Due Process is protection of the individual against arbitrary action of the Government.

32.    In Wolf, the Court held that it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed. See Duarte v. U.S., 532 F.2d 850, 852 (2nd Cir. 1976)("where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Quoting Bivens v. Six Unknown Fed. Narcotics Agents, 29 L.Ed.2d 619 (1971)).   In Bell v. Hood, 90 L.Ed 939, 944 (1946), the Court stated, "it is...well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."   See also Butz v. Economou, 57 L.Ed.2d 895 (1978).


33.    Defendants have deprived Plaintiffs of meaningful access to the courts. Defendants allow Plaintiffs to mail their pleadings to the courts, but mere formal right of access to the courts does not pass constitutional muster, See Ryland. The access must be adequate, effective and meaningful. Interference with the right of access to the courts gives rise to a claim for relief, e.g. Sigafus v. Brown, 416 F.2d 105 (7th Cir. 1969). Defendants' action robbed Plaintiffs of their otherwise significant constitutional rights. See McCray v. Maryland, 456 F.2d 1 (4th Cir. 1972)(reasoning, "Of what avail is it to the individual to arm him with a panoply of constitutional rights if, when he seeks to vindicate them, the courtroom can be hermetically sealed against him . . ..")

13

34.    As a direct result of Defendants' denial of Plaintiffs' right of access to the courts and of depriving Plaintiffs of their constitutional rights, Plaintiffs have no avenue to seek redress of their claims. All circuit courts in this country have essentially ratified Defendants' violations by refusing Booker's clear holding to Plaintiffs, e.g., Cirilo-Munoz v. U.S., 404 F.3d 527 (1st Cir. 2005); Green v. U.S., 397 F.3d 101 (2nd Cir. 2005); In re Olopade, 403 F.3d 159 (3rd Cir. 2005); Daniel v. U.S., 377 F.Supp.2d 537 (N.D.W.VA. 2005)[4th Cir]; U.S. v. Gentry, 432 F.3d 600 (5th Cir. 2005); Humphress v. U.S., 398 F.3d 855 (6th Cir. 2005); McReynold v. U.S., 397 F.3d 855 (7th Cir. 2005); Never Misses a Shot v. U.S., 413 F.3d 781 (8th Cir. 2005); U.S. v. Cruz, 423 F.3d 1119 (9th Cir. 2005); Varela v. U.S., 400 F.3d 864 (10th Cir. 2005); In re Anderson, 396 F.3d 1336 (11th Cir. 2005); In re Zambrano, No. 05-3106a (D.C. Cir. Jan. 10, 2006).

35.    In U.S. v. Sakaily, 424 F.3d 514, 518 (6th Cir. 2005), the Court noted "these decisions (set forth above) deny any avenue of relief under Booker to defendants whose appeals were final at the time that decision was rendered." (emphasis added). Defendants have denied Plaintiffs a forum for redresss of their Booker constitutional claims. See U.S. v. Hernandez, 380 F.Supp.2d 746 (E.D. Va. 2005)(stating the issue is not whether such a mandatory regime is unconstitutional; that was settled in Booker).

36.    By using the obstructionistic doctrines, e.g. the Avoidance Doctrine, the unconstitutionality of these laws is skirted and

Plaintiffs' rights, including that of the Great Writ are trampled. As a result of the Defendants' conduct, the courts abdicated their responsibility of maintaining unimpaired access, and that is obstructionism.

37. As a direct result of Defendants' actions, set forth below, Plaintiffs have been denied a reasonable opportunity to have their claims heard by the courts on the merits. See U.S. v. Lloyd, 188 F.3d 184 (3rd Cir. 1999)(holding that the AEDPA should be interpreted in a manner that preserves a reasonable opportunity for assertion of newly recognized rights.) Moreover, the need to afford a fair opportunity to challenge and present a claim following reinterpretation of a criminal statute has constitutional implications. See In re Dorsainvil, 199 F.3d 245, 248 (3rd Cir. 1997)("Were no other avenue of judicial review available for a party who claims . . . as a result of a previously unavailable statutory interpretation, we would be faced with a thorny constitutional issue.")

## The Anti-terrorism and Effective Death Penalty Act

38. In 1996, Congress passed the Anti-Terrorism and Effective Death Penalty Act (AEDPA), to reduce the number of so called frivolous habeas applications. It provides four limitations on the application for a Writ of Habeas Corpus:

A 1-year period of limitation shall apply to a motion under this section. The limitation shall run from the latest of -

(1) the date of the judgment of conviction becomes final;

15

(2) the date on which the impediment to making a motion created by the governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such government action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

39.    The AEDPA further restricted an application for a writ when that application was a second, or successive, application:

A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain --

(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found the movant guilty of the offense; or

(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

40.    What is patently obvious is that in passing the AEDPA, Congress made no provision at all for the redress of a grievance when an act, passed by both houses of Congress and signed by the President, is declared unconstitutional. (e.g. the U.S.S.G. held unconstitutional by the Supreme Court in Booker.) The courts operate on the presumptiveness of the constitutionality of acts of Congress so passed. See Spector Motor Service, Inc. v. McLaughlin, 89 L.Ed 101 (1944)("We decline to address it here in the first instance,

16

particularly in light of the well settled doctrine that we avoid constitutional questions whenever possible.")

41.     As a result of the failure of Congress to provide a means to bring before the court the correction of a sentence declared to be illegal by the Supreme Court, a suspension of the Writ of Habeas Corpus, specifically forbidden by the U.S. Constitution, occurred. (See U.S. Constitution, Article I, Section 9, clause 2). As the astute and learned Justice David Souter observed in Lindh v. Murphy, 138 L.Ed.2d 481 (1997), "All we can say is that in a world of silk purses and pig's ears, the Act [AEDPA] is not a silk purse of the art of statutory drafting."

42.     Habeas Corpus is not a luxury or an extravagance to be tolerated only when convenience permits. It is a fundamental protection of liberty "against arbitrary and wrongful imprisonment" that predates these United States. See Erwin Chemerinsky, Thinking About Habeas Corpus, 37 CASE W. RES. L. REV. 748, 749 (1987). The Framers viewed it as "the highest safeguard of liberty," Smith v. Bennett, 6 L.Ed.2d 39 (1961) -- a protection against arbitrary punishment and convictions to be "provided for in the most ample manner," THE FEDERALIST NO. 83 (Alexander Hamilton).

43.     Since the 1970's, however, the road to habeas relief has "become a narrow, more tortuous track among concealed snake-pits and anti-personnel mines calculated to daze cartographers and daunt a modern Gilgamesh." Anthony G. Amsterdam, Foreward, to JAMES S.

LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE,
AT V (2d Ed. 1994). The courts continue to pile on "petty procedural
barriers," resulting in a Byzantine morass of arbitrary,
unnecessary, and unjustifiable impediments to the vindication of
federal rights." Coleman v. Thompson, 115 L.Ed.2d 640
(1991)(Blackmun, J. dissenting.) This is a great tragedy.

44.    While Plaintiffs recognize that technically The Writ exists
only as a procedural device, "history is inextricably intertwined
with the growth of fundamental rights of personal liberty." Fay v.
Noia, 9 L.Ed.2d 837 (1963). A threat to the vitality of the Writ is
a threat to those very fundamental rights. "It must never be
forgotten that the Writ of Habeas Corpus is the precious safeguard
of personal liberty and there is no higher duty than to maintain it
unimpaired." Bowen v. Johnston, 83 L.Ed 455 (1939).

45.    In the Federalist Papers No. 84, by Alexander Hamilton, the
following statement of the Founders' original intent is found: "The
most considerable of the remaining objections [to the 1787
Constitution] is that the plan of the convention contains no bill of
rights." Hamilton then gives an answer to these objections. He says
that the structure of the Government itself providing only for
enumerated powers and for checks and balances is one of the answers
to these objections. Beyond that, he answers the objections as
follows:

> Independent of those [answers] which relate to the structure
> of the government, we find the following: . . . Section 9
> [Article I] clause 2 -- "The privileges of the Writ of
> Habeas Corpus shall not be suspended, unless when in cases

of rebellion or invasion the public safety may require it .
. .' [T]he practice of arbitrary imprisonments, have been,
in all ages, the favorite and most formidable instrument of
tyranny. The observations of the judicious Blackstone, in
reference to the latter, are well worthy of recital: . . .
'confinement of the person, by secretly hurrying him to
jail, where his sufferings are unknown or forgotten, is a
less public, a less striking, and, therefore a more
dangerous engine of arbitrary government.' And as a remedy
for this fatal evil he [Blackstone] is everywhere peculiarly
emphatical in his ecomiums on the Habeas Corpus act, which
in one place he calls 'the Bulwark of the British
Constitution.'

46.   Hamilton's comments regarding the fight for inclusion of a
Bill of Rights, and specifically "Great Writ" rights are
emphatically significant in Plaintiffs' cases. Defendants' arbitrary
and capricious actions have violated the essence, spirit and literal
language of the Great Writ. Despite our Forefathers struggle for
such rights, and a system of checks and balances, Defendants'
actions and conduct operate as a suspension of Plaintiffs' rights.
Such arbitrary governmental action by Defendants against Plaintiffs
threatens liberty and justice everywhere.


THE GREAT WRIT


47.   The Writ of Habeas Corpus is the only writ named in the
Constitution. So great was its importance for the preservation of
liberty that the members of the Constitutional Convention equated
it, along with the structural provisions, with a Bill of Rights. If
state ratification conventions had not insisted on a Bill of Rights,
the federal courts would have had to create an unwritten Bill of
Rights using the Writ of Habeas Corpus and the doctrine that the
elected branches are limited to the enumerated powers named in the

Constitution. Because of the importance of the clause forbidding the suspension of the Writ, the Supreme Court has refused to allow Congress, the Executive Branch, or the lower courts to seriously reduce its coverage and protections. For example, in INS v. St. Cyr, 150 L.Ed.2d 347 (2001), the Supreme Court refused to adhere to an interpretation of an immigration statute and the AEDPA that "would give rise to substantial constitutional questions" under the Suspension Clause.

48.   The courts almost universally, post-Booker I, have made two issues clear: 1) any sentence imposed under the mandatory application of the United States Sentencing Guidelines is unconstitutional and illegal; and 2) any inmate suffering under such an illegal sentence is, pursuant to the AEDPA, effectively prohibited from bringing his claim in court for redress. This Due Process denial of adequate and meaningful access to the courts has been experienced in some manner by each of the named Plaintiffs and an entire identifiable class of individuals currently suffering under illegal sentences and effectively blocked from the courts.

49.   Though the AEDPA may have the facial appearance of constitutionality, in a post-Booker I world, it is grossly discriminatory in its operation, standing the Constitution on its head. See Williams v. Illinois, supra, at U.S. 242 (where "a law non-discriminatory on its face may be grossly discriminatory in its operations.) Facially, the AEDPA provides for adequate opportunity for collateral challenges to illegal sentences. The AEDPA's

20

application, however, is an illusion when the AEDPA makes no provision to challenge sentences imposed under an act, drafted by Congress and signed by the President, that is declared unconstitutional and illegal.

50.    Defendants' actions denied Plaintiffs' right of access to the courts. Sadly, were this an application in a civil case dealing in real property as opposed to the results of a criminal proceeding with a liberty interest, adequate opportunity would exist to establish jurisdiction for review. C.f. Rule 60(b) of the Federal Rules of Civil Procedure which provides:

> On motion and upon such terms as are just, the court may relieve a party, or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
>
> 1) mistake, inadvertance, surprise, or excusable neglect;
>
> 2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
>
> 3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
>
> 4) the judgment is void;
>
> 5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or
>
> 6) any other reason justifying relief from the operation of the judgment.

51.    Sections 1 through 3 of the rule have a 1 year limitation analogous to provisions 1 through 4 of the AEDPA provisions of 28 U.S.C. §2255. However, sections 4 through 6 of Rule 60(b) have no

such limitations. Further, section 6 of Rule 60(b), is a "catch-all" provision, albeit with a high threshold -- it does provide access to the courts in civil cases for issues not enumerated in sections 1 through 5. With such broadly encompassing provisions made for redress in civil matters when the issue is simply a property interest, it defies understanding how controversies involving a liberty interest can be so flippantly dismissed on procedural grounds.

52.    The gate-keeping requirements of the so-called savings clause of 28 U.S.C. §2255, another AEDPA creation, provides no shelter and in fact erects further barriers rather than provide the necessary opportunity of a jurisdictional basis for the redress of an illegal sentence through the historically applicable §2241. It states:

> An application for a Writ of Habeas Corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

53.    The challenge for a petitioner occurs when he must prove the §2255 is "inadequate or ineffective." As the Fifth Circuit noted in U.S. v. Reyes-Requena, 243 F.3d 893 (5th Cir. 2001), "The savings clause and habeas writs (e.g. §2241) exist in a delicate balance. Section 2255 is the primary collateral relief mechanism for federal prisoners, and the savings clause cannot create a detour around §2255 such that §2255 is rendered a nullity."

54.    But as the D.C. Circuit Court observed, "The language of the AEDPA . . . is at best ambiguous." Ozoanya v. Reno, 968 F.Supp. 1 (DDC 1997). This is further complicated by the fact that no court has ever defined the limits, and meaning, of "inadequate and ineffective." This has allowed the courts to place such cases in the never-ending conundrum of denial of a §2255 based on Congressional failure to provide any provision for redress of an illegal sentence imposed by an unconstitutional sentencing scheme, then denying access via §2241 based on failure to prove the deficient §2255 as inadequate and ineffective.

55.    As the Fifth Circuit stated further in Reyes-Requena, ". . . if Congress had not included the savings clause in §2255, it is arguable that a problem would exist under the Suspension Clause."

56.    Title 28 U.S.C. §2255 is the primary means under which a federal prisoner may collaterally attack the legality of his conviction or sentence. However, §2241 may be utilized by a federal prisoner to challenge the legality of his or her conviction or sentence, but only if he or she can satisfy the mandates of the so-called "savings clause." See Reyes-Requena, supra.

57.    The failure of Congress to provide a procedure to redress a grievance created when an act of Congress is declared unconstitutional, constitutes a suspension of the Writ.

> Conventional notions of finality of litigation have no place
> where life or liberty is at stake and infringement of

23

> Constitutional rights is alleged. If 'government . . .[is]
> always [to] be accountable to the judiciary for a man's
> imprisonment,' access to the courts on habeas must not be
> thus impeded. The inapplicability of res judicata to habeas,
> then, is inherent in the very role and function of the writ.

Sanders v. U.S., 10 L.Ed.2d 148 (1963)


58.    The D.C. Circuit previously ruled, "A statute that removes

jurisdiction from all courts to vindicate constitutional rights

poses serious constitutional objections." Ramallo v. Reno, 114 F.3d

1210 (D.C. Circuit 1997). See Bartlett v. Bowen, 816 F.2d 695, 703

(D.C. Circuit 1987)("In our view, a statutory provision precluding

all judicial review of constitutional issues removes from the courts

an essential judicial function under our implied constitutional

mandate of separation of powers, and deprives an individual of an

independent forum for the adjudication of a claim of constitutional

right.)


59.    Due Process requires more as the stakes and therefore the

costs of error rise:

> The fundamental requirement of due process is the
> opportunity to be heard 'a meaningful time and in a
> meaningful manner' . . . [d]ue process 'unlike some legal
> rules, is not a technical conception with a fixed content
> unrelated to time, place and circumstances.' . . . due
> process generally requires consideration of three distinct
> factors: first, the private interest that will be affected
> by the official action; second, the risk of an erroneous
> deprivation of such interest through the procedures used,
> and the probable value, if any, of additional or substitute
> procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute
> procedural requirement would entail.'

Matthews v. Eldridge, 47 L.Ed.2d 18 (1976).

60.    Nothing is more sacred to a citizen, ostensibly living under the protections of the U.S. Constitution, than his fundamental right to be free. When his continued incarceration is based on a sentencing scheme declared unconstitutional and illegal by the Supreme Court, and no provision is made to have that illegal incarceration corrected, fundamental Due Process has been violated and the Suspension Clause has been implicated.

## AVOIDANCE DOCTRINE

61.    Further, denial of the substantive right of access to the courts occurs when the courts invoke the doctrine of constitutional avoidance which mandates courts to construe legislative acts with a presumption of constitutionality. The presumption is that when an act of Congress passes both Houses and is signed by the President, it is constitutionally sound. See Aptheker v. Secretary of State, 12 L.Ed.2d 992 (1964). The courts have been faithful in their application of this doctrine.

> ...the principle of constitutional adjudication which makes it decisive in the choice of fair alternatives that one construction [which] may raise serious constitutional questions [be] avoided by another.' United States v Rumely, 345 US 41, 45, 97 L Ed 770, 73 S Ct 543 (emphasis added). Along the same vein, Mr. Chief Justice Hughes has noted, 'if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' Crowell v Benson, 285 US 22, 62, 76 L Ed 598, 52 S Ct 285 (emphasis added). Both of these references to that 'cardinal principle' of statutory construction contain the caveat that resort to an alternative construction to avoid deciding a constitutional question is appropriate only when such a course if 'fairly possible' or when the statute provides a 'fair alternative' construction.

Swain v. Pressley, 51 L.Ed.2d 411, 418 FN 11.

62.     In the Plaintiffs' cases, in the application of the
avoidance doctrine regarding the AEDPA's constitutionality, there is
no possible or alternative construction on the AEDPA's
constitutionality. The language in the AEDPA does not provide for
acts of Congress which have been ruled unconstitutional, such as the
portion of the U.S.S.G.

63.     Congress passed the SRA of 1984, establishing the mandatory
U.S.S.G.. At its inception, the mandatory guidelines were
unconstitutional. The courts began implementing the guidelines in
1987. The sentences imposed by the courts pursuant to the mandatory
guidelines were hotly contested by the Plaintiffs. By applying the
avoidance doctrine, the courts effectively and methodically denied
all challenges to the constitutionality of the SRA's scheme, thus
denying meaningful access to the courts on issues that were in fact
unconstitutional.

64.     The Courts' first duty is to uphold the Constitution,
protecting the rights of the American citizens. This duty is the
core purpose and responsibility of the courts in the administration
of justice. The courts must insure the structure, integrity and
purpose of the Constitution are preserved.

65.     Justice Stevens in his Supreme Court opinion in Booker I,
left no doubt that the SRA's mandatory scheme is unconstitutional.

26

The lower courts' continued application of the avoidance doctrine is misplaced. An unconstitutional deprivation of individual rights is a matter for the courts of this country to meet head on and settle. Any rule, statute|| policy consideration, or directive used by the Defendants that hinders or prevents this from being accomplished is a total disregard for the Rule of Law, and is in and of itself unconstitutional.

66.    The preservation of Plaintiffs' constitutional rights announced in Booker I, supersedes the Defendants' interest in maintaining any act which is unconstitutional. Plaintiffs' constitutional rights supersedes the courts' interest in the finality of the judgment when that judgment is based on that which has been declared unconstitutional. The Defendants in this case, in their ongoing effort to advocate, or ignore the continued violation of the Plaintiffs' constitutional rights are attempting to stand the avoidance doctrine on its head and balance it there while the Plaintiffs suffer the deprivation of long-standing rights under the Constitution.

67.    The Defendants' use of the avoidance doctrine and its progeny in the post-Booker I era have denied the Plaintiffs any true and meaningful access to the courts. Plaintiffs' claim can be validated by reviewing the case law concerning the clear ruling in Booker I. One example of this is the Fifth Circuit's decision in Gentry, supra, (stating that Booker is not available to initial §2255 motions.) Another example of denial of meaningful access to

the courts is in Plaintiff Doggett's case, in which the District
Court's application of the avoidance doctrine to his §2255 in June,
2005, effectively ignored the clear ruling in Booker I.

68.    In  Plaintiff  Doggett's  case,  the  Fifth  Circuit  has
foreclosed  a  full  and  meaningful  access  to  the  court  on  the
constitutionality of his well-preserved issues. Plaintiff Doggett's
case is the precedent case of the Fifth Circuit on Apprendi issues.
The  Fifth  Circuit's  decision  in  U.S.  v.  Doggett,  230 F.3d 160
(2000), is contrary to Booker I, yet the Court in Gentry, supra,
effectively  blocked  any  avenue  to  redress  the  deprivation  of
Doggett's constitutional rights.

69.    Doggett's case is just one example from thousands of others
in which criminal defendants have been denied meaningful access to
the  courts.  Whether  the  Defendants  have  renamed  the  avoidance
doctrine, or made creative use of its intent, the effect is the
unconstitutional deprivation of Plaintiffs' constitutional rights by
Defendants denying their meaningful access to the courts.

70.    Plaintiffs seek due process protection: true and meaningful
access  to  the  courts,  pursuant  to  Booker I. Plaintiffs  suffer  a
continuous  constitutional  rights  violation  simply  because  the
Defendants avoided addressing the merits. In avoiding the issues,
the Defendants have created a special class of people by failing to
provide  a  remedy  to  correct  the  constitutional  violations.  This
special  class  is  made  up  of  criminal  defendants  sentenced  between

1987 and 2005. criminal defendants sentenced before 1987 did not suffer from the constitutional violations that Plaintiffs do today.

71.      Because Plaintiffs have a clear right of access to the courts and Defendants denied Plaintiffs' rights, Defendants are liable to Plaintiffs for their violation.

## VI. COUNT TWO--CONSPIRACY TO VIOLATE PLAINTIFFS' RIGHTS; CONSPIRACY TO OBSTRUCT JUSTICE

72.      In denying Plaintiffs their right of access to the courts, Defendants have created separate classes: (1) those whose cases were final at the time of the ruling in Booker, timely filed a §2255 motion, but were denied access to a ruling on the merits of their claims; (2) those whose sentences were final subsequent to the ruling in Booker, filed a first §2255 motion pursuant to ¶6(3) of 28 U.S.C. §2255 and were denied as untimely filed; (3) those who, subsequent to the ruling in Booker, filed a §2255 motion and were denied access to the courts, as the courts misconstrued their filing as a second or successive §2255 pursuant to ¶8 and procedurally barred them; (4) those who filed §2241 petitions and were denied access as having failed to meet the standards of AEDPA's gatekeeping requirement, the so-called "savings clause"; (5) those who were convicted pre-Booker, but whose judgments were not yet final, where courts have denied a proper hearing on the merits of the claims; and (6) those who

29

were convicted, pursuant trial or plea, whose cases were final
and who filed a second, or successive §2255 motion.

73.      The United States Department of Justice circulated
memos instructing the courts on methods to prevent Plaintiffs the
opportunity of being heard on the merits.  Defendants conspired
to obstruct justice, deprive Plaintiffs equal protection of law
and equal protection of privileges and immunities to which
Plaintiffs are entitled.  Moreover, Plaintiffs' Equal Protection
rights are also violated, where State prosecuted persons are not
denied access to courts through AEDPA's procedural bars.

74.      Defendants Sensenbrenner and Apperson have furthered
the conspiracy by interfering in the process of court action
through intimidation, including all the acts set forth herein.
Plaintiffs have in fact been deprived of their rights, privileges
and immunities as citizens of the United States.  Defendants'
actions conspired to obstruct justice and violated Plaintiffs'
rights.

75.      Further, Defendants conspired against Plaintiffs by
writing and distributing letters to the Department of Justice,
the Executive Office of U.S. Attorneys, the Executive Office of
the Courts and named U.S. Attorneys.  Defendants' acts obstructed
the application of the rulings in _Blakely_ and _Booker_ which denied
Plaintiffs' constitutional rights to equal protection and access
to the courts.

76.     Plaintiffs individually and as representative class members have been denied full and meaningful access to the courts as a result of Defendants' coordinated efforts. Overt acts have included such events as U.S. Representative James Sensenbrenner's effort to influence the Court in <u>U.S. v. Rivera</u>, 411 F.3d 864 (7th Cir. 2005) This letter to the Court not only violates the separation of powers doctrine, but illustrates the Class animus directed at Plaintiffs by government officials.

77.     Plaintiffs are currently serving sentences based on an unconstitutional sentencing scheme, because of Defendants conduct violating Plaintiffs' right of access to the courts. According to government testimony in oral agruments before the U.S. Supreme Court in the <u>Booker</u> case, this comprises approximately sixty percent of all federal prisoners.

78.     Because Defendants' actions conspired to obstruct justice and denied Plaintiffs' right of access, Defendants have violated Plaintiffs' rights.

## VII. COUNT THREE--FAILURE TO PREVENT CONSPIRACY

79.     Defendants Alberto Gonzales and the Executive Office of U.S. Attorneys have violated Plaintiffs' rights by failing to prevent the above-stated conspiracy. Defendants had knowledge of the wrongful acts in Count Two, but totally failed to take any action to prevent the conspiracy.

80.    Defendants knew of the conspiracy, they were in a position to prevent the implementation of that conspiracy to deprive Plaintiffs' rights, and neglected or refused to prevent it, thus they are liable. See Walker v. Butkovich, 584 F. Supp. 909, 943 (M.D.N.C. 1984); Abergman v. U.S., 579 F. Supp. 911, 934-35 (W.D.Mich. 1984); Symkowski v. Miller, 294 F. Supp. 1214, 1217 (E.D.Wis. 1969). Defendants are trained in the doctrines of the law and work with conspiracies every day. Defendants were aware a conspiracy to deprive Plaintiffs of their constitutionally guaranteed substantive right of access to the courts existed and failed to prevent it.

81.    Defendants cannot hide behind the veil of either qualified or absolute immunity. Participation in a conspiracy, or failing to prevent one, is outside the scope of their responsibilities and removes such as a defense. Defendants cannot receive the benefit of protection to cover for willful negligence, or deliberate violation of the Constitution. The Court stated in Butz v. Economou, 57 L Ed.2d 895 (1978);

> Since an unconstitutional act, even if authorized by statute, was viewed as not authorized in contemplation of law, there could be no immunity defense, Id at 906. ....None of these decisions, with respect to state officials furnishes any support for the submission of the United States that federal officials are absolutely immune from liability for their constitutional transgressions. On the contrary, with impressive unanimity, the Federal Courts of Appeals have concluded that federal officials should receive no greater degree of protection from constitutional claims than their counterparts in state government, Id at 911.

32

## VIII. MOTION FOR CLASS CERTIFICATION

82.      Plaintiffs    bring    their    claims    herein    as    class
representatives pursuant to Federal Rule of Civil Procedure 23 on
their behalf and all others similarly situated.

83.      The   Class   will   consist   of   all   persons   who   were
sentenced   or   on   supervised   release,   pursuant   to   the   SRA
implemented in 1987, regardless of their current custody status.
Being an inmate is not a prerequisite for class membership, but
rather, persons who have been denied access to courts may be
inmates.

84.       Illustratively, the proposed class includes, but is not
limited to, those situated as follows:

          (1)   Those who were convicted, pursuant to trial or
          plea, whose cases were final and who filed a timely
          first §2255 motion;

          (2)   those who were convicted, pursuant to trial or
          plea, whose cases were final and who filed an out-of-
          time first §2255 motion;

          (3)   those who filed a first §2255 motion, pursuant to
          28 U.S.C. §2255 ¶6(3), See U.S. v. Dodd, 162 L.Ed.2d
          343 (2005) (motions denied as second or successive,
          pursuant to §2255 ¶8);

          (4)    those who filed §2241 motions and were denied
          access as having failed to meet AEDPA's gatekeeping
          requirement;

          (5)   those who were convicted, pursuant to trial or
          plea, whose cases were not yet final when the Court
          decided Booker I;

          (6)   those who were convicted, pursuant to trial or
          plea, whose cases were final and who filed a second, or

33

successive §2255 motion.

85.    Alternatively, the Class should include, at a minimum, those who have been denied access to courts subsequent to the Booker ruling in January 2005.

86.    This suit meets the requirement of FRCP 23(a) for class certification because: (a) the Class is so numerous that joinder of all members is impractical (in excess of 100,000); (b) there is at least one question of law and/or fact common to the Class; (c) Plaintiffs' claims are typical of the claims of the Class; and (d) Plaintiffs can and will fairly and adequately represent the interests of the Class.

87.    Regarding numerosity, Plaintiffs believe the Class consists of tens of thousands of members in the Federal Bureau of Prisons and joinders of all those members is certainly impractical.

88.    Regarding commonality, the following are, inter alia, some of the questions of fact and/or law common to the Class: (a) Is AEDPA constitutional after Booker I, because no provision in AEDPA allows an adequate, effective, and meaningful way to present claims? (b) Have Plaintiffs and class members writs been suspended after Booker I?

89.    Plaintiffs' claims are typical of the Class' claims as

34

a whole because Plaintiffs claims are just like all other class members. Further, there are no material differences between Plaintiffs' claims and those of other class members. Finally, Plaintiffs have no interest antagonistic to, or in conflict with, the interests of the remainder of the Class.

90.    It is appropriate to maintain this lawsuit as a class action because Plaintiffs meet all the requirements of FRCP 23(a) and because a class action is a superior method of bringing Plaintiffs' claims and the Class' claims against Defendants.

91.    Pursuant to FRCP 23(g)(1), Plaintiffs are entitled to the appointment of class counsel. The rule provides, "Appointing class counsel...unless a statute provides otherwise, a court that certifies a class must appoint class counsel." Accordingly, Plaintiffs request the appointment of class counsel. Additionally, pursuant to 23(g)(2), Plaintiffs seek interim class counsel to act on behalf of the punitive Class before the Court has determined whether to certify the action as a class action.

## IX. DAMAGES

92.    As a direct and proximate result of Defendants' acts denying Plaintiffs their right of access to the courts, Plaintiffs' constitutional rights have been violated.

## X. CONCLUSION

93.     FOR THESE REASONS set forth above, Defendants have denied Plaintiffs and all class members their right to access the courts and present their clear constitutional claims. All above Defendants' acts have violated Plaintiffs' rights. Defendants are thus, liable to Plaintiffs for the violation.

94.     All Defendants' acts were done willfully, maliciously and with reckless disregard of Plaintiffs' rights, privileges and immunities as provided by the United States Constitution.

## XI. PRAYER

95.     WHEREFORE, Plaintiffs demand, individually and on behalf of all others similarly situated, the Court GRANT the following relief:

    A)    Enter an Order certifying this case to proceed as a class action with Plaintiffs as the Class Representatives, appointing interim class counsel and appointing class counsel;

    B)    Enter a judgment requiring Defendants to pay, jointly and severally, damages in the amount of $ 1,000,000 Dollars for each Plaintiff, to compensate Plaintiffs for Defendants' conduct denying Plaintiffs' right of access to the courts and any other theory of recovery;

    C)    Enter a judgment awarding punitive damages in an amount sufficient to deter Defendants conduct;

36

D)   Enter  a  judgment  awarding  Plaintiffs  reasonable
attorneys' fees incurred in this action; and

E)   Enter a judgment awarding Plaintiffs and the Class all
other relief to which they may be justly entitled, including
costs of court, and all other relief, legal and equitable,
this Court deems appropriate and just.

## XII. JURY DEMAND

96.      Plaintiffs  demand  a  trial  by  jury,  pursuant  to  the
Seventh Amendment of the United States Constitution and the
Federal Rules of Civil Procedure.

It is so Prayed.  May it be so ORDERED.

Respectfully submitted,


Rodney Doggett
#83059-080
P. O. Box 9000
Seagoville, TX 75159

Russell Kaemmerling
#04899-017
P. O. Box 9000
Seagoville, TX 75159

Gary Callahan
#01628-196
P. O. Box 9000
Seagoville, TX 75159

Brian Culwell
#66552-079
P. O. Box 9000
Seagoville, TX 75159